IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

| | | |
|---|---|---|
| THE PRYORS COALITION; WILDLANDS CPR; EASTERN WILDLANDS CHAPTER OF THE MONTANA WILDERNESS ASSOC.; YELLOWSTONE VALLEY AUDUBON SOCIETY; THE FRONTIER HERITAGE ALLIANCE; THE BEARTOOTH BACKCOUNTRY HORSEMEN; RICHARD WALTON, an individual; SUSAN W. NEWELL, an individual; and PHIL JAQUITH, an individual, JAQUITH; | ) ) ) ) ) ) ) ) ) ) | CV-10-16-BLG-RFC |
| Plaintiffs, | ) ) ) | ORDER |
| vs. | ) ) | |
| LESLIE WELDON, in her official capacity as Regional Forester for the United States Forest; MARY ERICKSON, in her official capacity as Acting Forest Supervisor of the Custer National Forest ; and the UNITED STATES FOREST SERVICE; | ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | |

TREASURE STATE ATV ASSOC.; MONTANA )
TRAIL VEHICLE ASSOC.; GREAT FALLS )
TRAIL BIKE RIDERS ASSOC.; FAMILIES )
FOR OUTDOOR RECREATION; CITIZENS )
FOR BALANCED USE; and THE BLUERIBBON)
COALITION; )
                                       )
                Intervenor-Applicants. )
_____)

Currently pending before the Court are the Parties' cross-motions for summary judgment. In bringing their Complaint, Plaintiffs are alleging that Defendants' implementation of the Record of Decision that sanctioned motorized vehicle use within the Beartooth Ranger District would threaten certain aspects of the unique and fragile ecological habitats found within the District. After review and consideration of the administrative record and the parties' briefing, the Court is prepared to rule.

## FACTUAL BACKGROUND

Plaintiffs are comprised of groups and individuals who use and enjoy the natural wilderness of the Pryor and Absaroka Mountain ranges. Defendants United States Forest Service and their officials represent the governmental agency that is delegated to manage the Beartooth Ranger District within which the Pryor and Absaroka Mountains range are contained. In addition, Intervenor-Applicants

Great Falls Trail Bike Riders Association, et. al have also joined in Defendants'
Cross-Motion for Summary Judgment.

In December 2005, per direction of Executive Orders 11644 and 11989, the
Travel Management Rule ("TMR") became effective and provided for the
regulation of motor vehicles. The TMR provides a framework for Defendants to
designate and map routes for public motorized use and development of a Travel
Management Plan ("TMP"). Further, the TMR prohibits cross-country motorized
travel outside of designated routes. Part of the reasoning for creating a motorized
vehicle public use map is to enable criminal penalization for the possession and/or
operation of a motor vehicle in non-designated areas. *36 C.F.R. §§ 212.51,
212.56.*

On June 2, 2008, Defendant U.S. Forest Service signed the Beartooth Travel
Management Record of Decision ("ROD"). The ROD was implemented on
September 23, 2008. The decision designated certain existing routes in the Pryor
and Beartooth Mountain ranges for public motorized use within the Beartooth
Ranger District. The purpose of the decision was to protect and manage increased
motorized and non-motorized recreational use within the Beartooth Ranger
District from negative social and ecological impacts.[1]

---

[1]*ROD at 1.*

For purposes of discussion, the routes shall be divided into the Pryor Unit and the Beartooth Unit. The Beartooth Unit includes parts of the Absaroka-Beartooth wilderness and includes the Gallatin National Forest on the west and has some common boundary with the Shoshone National Forest in Wyoming to the south. The Pryor Unit contains the southern portion of the Pryor Mountain Range. This unit is bordered on the north by the Crow Reservation. The entire south boundary and the majority of the east and west boundaries are shared with BLM.

According to Defendants, all newly designated motorized use under the ROD is based on routes already existing on the ground and creates no new routes. Rather, it is nothing more than a legal designation that is intended to implement the aforementioned TMR and institute a TMP.

This new ROD is intended to map existing "system" and "non-system" routes within the Beartooth Ranger District. "System" routes are defined as roads and trails that are determined by the Forest Service as necessary for the protection, administration and utilization of the Forest Service System. *36 C.F.R. § 261.13.* "Non-system" routes generally refers to temporary roads/trails or unauthorized roads/trails. *36 C.F.R. § 212.1.*

Plaintiffs allege that the new TMP: makes 99% of the existing roads and trails in the Pryors available for motorized vehicle use; authorizes dispersed

vehicle camping within 300 feet of either side of every motorized road and trail in the Pryor Mountains; and permanently and negatively impairs land productivity and soil quality.

Based on these allegations, Plaintiffs allege in the Complaint that Defendants have failed to comply with and consequently violate the National Environmental Policy Act ("NEPA"), the 2005 TMR, Executive Order 11644, and the National Forest Management Act ("NFMA"). All of these substantive claims fall under Plaintiffs' claims that Defendants violated the Administrative Procedures Act.

## STANDARD OF REVIEW

The Administrative Procedures Act ("APA") provides the authority for judicial review of agency decisions under NFMA and NEPA. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006). The APA requires that a reviewing court "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be-arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *5 U.S.C. § 706(2)(A)*. This arbitrary and capricious standard is deferential and as such, an agency will be reversed as arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an

explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ecology Ctr. v. Castaneda,* 574 F.3d 652, 656 (9th Cir. 2009).

Nevertheless, the Court must review the administrative action to ensure that the agency has sufficiently "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43(1983) *(*quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). In reviewing the agency's explanation, the Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 285(1975)); see also *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416 (1971).

## DISCUSSION

I. *Making Existing Roads and Trails Available for Motorized Vehicle Use.*

Relying on NEPA, NFMA, and the TMR, Plaintiffs alleged that Defendants arbitrarily and capriciously converted unauthorized user-created and non-system routes into motorized vehicle use routes without first taking a hard look at the direct, indirect and cumulative impacts that its ROD would have on the Pryor Unit.

In addition, Plaintiffs allege that Defendants failed to take a hard look at a reasonable range of alternatives to their present ROD in order to mitigate the impacts of their final decision.

In making these allegations, Plaintiffs noted that these user-created and previously unauthorized routes were never included in Defendants' 1987 Travel Plan for the Custer National Forest area. Rather, they were illegally created by individuals driving cars, all-terrain vehicles, off-highway vehicles, and off-road motorcycles. Moreover, Plaintiffs contend that these user-created routes cause environmental damage. Specifically, Plaintiffs cite to Routes ## 2095A, 2096, 2814, part of 2088, and two miles of 2092.

Defendants contend that their decision to convert existing system and non-system routes to authorized system routes actually reduced the total miles for public motorized use from 287 miles to 267 miles.[2] Specifically in the Pryor Unit, where the crux of Plaintiffs' claims lie, Defendants contend that they reduced the miles of public motorized routes from 149 miles to 124 miles. *Id.* Because of these reductions in public motorized routes, Defendants contend that they have also reduced dispersed vehicle camping.

---

[2]*FEIS 2-37.*

In reaching their final ROD, Defendants contend that they reasonably relied on a Final Environmental Impact Statement ("FEIS") that considered the impact of converting non-system routes to system routes as well as alternatives.

The Court notes that before the FEIS was published, it is undisputed that Defendants held numerous open forum discussions starting in February 9, 2004 and running through November 1, 2007 to allow for public participation to raise concerns by interested parties regarding the Beartooth Ranger District Travel Management Environmental Impact Statement.[3] A review of the FEIS reflects that Defendants considered five alternatives regarding the development of a travel management plan for the Beartooth Ranger District: Alternative A, Alternative B, Alternative B Modified, Alternative C and the No Action Alternative.[4]

Each Alternative reflected Defendants' consideration of the competing interests between the recreational motorized-use activists and the recreational non-motorized use activists. It is evident that although both groups have a shared enthusiasm for the outdoors, their approaches to achieving this are largely divergent.

---

[3]*FEIS, pp. # 2-1 to 2-2.* See also *Appendix C.*

[4]*FEIS, pp. # 2-9 to 2-20.* See also *Appendix C.*

Alternative A would have motorized recreation represent approximately three-quarters of the recreation experience within the Pryor Unit.[5] This would include loop experiences throughout the Pryor Unit including Big Pryor Mountain. Non-motorized recreationists (hikers, bicyclists and horseback riders) would most likely hear and encounter Off-Highway Vehicles ("OHVs") during their travels within the Pryor Unit.[6] This alternative is similar to the No Action Alternative and leans more toward interests of the motorized-use enthusiasts.

Alternative B would have two-thirds of the Pryor Unit designated for motorized use.[7] In addition, seasonal high-elevation loops would be available as well. However, non-motorized outdoor recreation enthusiasts would have large "enclaves" within the Pryor Unit with very little motorized use.[8] These areas would be expanded in size during the time when seasonal high-elevation loops are closed.

Regarding off-road motorcycle enthusiasts, although they would have access to motorized routes, they would no longer be allowed use of single track motorcycle routes.[9]

---

[5] *FEIS at 2-10.* See also *Appendix C.*

[6] *Id.*

[7] *Id. at 2-10 to 2-11.* See also *Appendix C.*

[8] *Id.*

[9] *Id.*

In arriving at Alternative B, Defendants addressed the following concerns that were raised in the course of public comment and participation:

- In Alternative B, the Dryhead Vista Loop (Road #2308B) would not be designated for public motorized use or administrative use, and would be converted to a non-motorized system trail. Forest visitors would be able to access the vista through non-motorized means. This action is being proposed to minimize impacts to traditional cultural practices in the area that are easily disturbed by motorized vehicle access and/or vandalism.

- The 300 foot access to dispersed camping allowance would not apply to the Main Fork of Rock Creek (Road #2421). Dispersed vehicle camping would continue to be allowed, but measures would be used to limit the expansion of existing sites and the creation of new sites to minimize impacts on cultural and natural resources.

- Portions of routes where cultural resources are of concern were removed from designation consideration due to potential of continued site degradation and vandalism.

- Portions of routes where soil and water resources are of concern were removed from designation consideration due to unacceptable erosion with little opportunity for engineered drainage without extremely high investment.

- Meyers Creek (Trail #27) and Lodgepole (Trail #22) trails were proposed not to be designated for motorized travel in favor of non-motorized opportunities and wildlife habitat emphasis.

- Season of use designations on roads above approximately 8,000 feet elevation to minimize road and resource damage during spring breakup or thawing of frozen soils and snow melt.[10]

---

[10]*Id. at 2-11.* See also *Appendix C.*

In response to public and internal comments regarding Alternative B, Defendants made changes which resulted in Alternative B Modified. This Alternative B Modified changed certain routes from highway-level vehicle use to mix-motorized use.[11]

Alternative C would designate large enclaves within the Pryor Unit with very little motorized use. Under this Alternative, half of the Unit would be accessible by motorized vehicles and the remaining half would be limited to non-motorized access. This alternative would also reduce dispersed vehicle camping. Further, this Alternative would require recreationists to use non-motorized means to access popular areas in the Pryor unit. This alternative would still prohibit motorcycle use on single track routes. This alternative leans more toward interests reflected by Plaintiffs and other non-motorized use enthusiasts.

Lastly, the Defendants' FEIS also provides the No Action Alternative. This alternative limits the TMP Plan to the existing route framework in the Beartooth Ranger District.[12] This is different from Alternative A which would designate both existing system and non-system routes. In addition, the No Action

---

[11]*Id., p. 2-27, Table 2-5. Alternative B Modified Elements Different from Alternative B and Rationale for Modification.* Mix-motorized use refers to routes that can be used by off-road vehicles, hikers and horseback riders.

[12]*Id., pp. # 2-12 to 2-13.* See also *Appendix C.*

Alternative would also include the use of existing vehicles and current use levels on all present routes.

After considering these Alternatives, Defendants decided that Alternative B Modified best reflected the balance of all competing interests across the recreational use spectrum, while reducing the overall environmental and cultural source impacts of system roads and trails.[13]

Under NEPA, federal agencies are required to rigorously explore and objectively evaluate all reasonable alternatives and to briefly discuss the reasons for eliminating any alternatives that were not developed in detail.[14] In this instance, it is evident that Defendants considered the broad spectrum of use alternative within the Beartooth Ranger District. The record further reflects that Defendants chose not to pursue an alternative that was overly favorable to one interest group at the detriment of another. Rather, the FEIS reflects that in reaching its conclusion that Alternative B Modified was the best alternative, Defendants were attempting to strike a balance as best as they could against the many competing interests.

Moreover, in reaching its decision, Defendants considered direct, indirect and cumulative impacts including, among others, land zoning, route construction,

---

[13]*FEIS, p. 2-24.*

[14]40 C.F.R § 1502.14.

seasonal game retrieval, road analysis, not adding non-system routes, soil issues, vegetation, and wildlife road density.[15]  In addition, Defendants did analyses and gave consideration to the effects of their ROD on water quality, wildlife, recreation and noise, and archaeological and cultural resources.[16]  Further, Defendants not only identified each non-system route that they converted to a system route, they provided rationale as to why the road was converted.  It is evident that Defendants' decisions regarding the development of a travel management map within the Beartooth Ranger District was not arbitrary and capricious.  Rather, careful consideration of the environmental impacts of their decisions were made in an effort to balance the competing uses within the area.

Having concluded that Defendants gave the requisite "hard look" in their decision to convert unauthorized user-created and non-system routes to motorized vehicle use routes, this Court now looks to Plaintiffs' specific objections. Regarding Route #2095A, Plaintiffs contend that the route is a "3.4 miles long user-created route that wanders through sensitive sub-alpine meadows Big Pryor plateau (above 8,000 feet) and into secure elk (and deer) habitat."[17]  Plaintiffs contend that by making this user-created route into a system route, Defendants

---

[15]*FEIS, pp. 2-20 to 2-23.*

[16]*FEIS 3-85 to 3-102, 3-111 to 3-124, 3-143 to 3-145, 3-14-3-34, 3-52 to 3-77, respectively.*

[17]*MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Doc. # 21) at 9.*

failed to perform the required detailed analysis of the impact on wildlife security, native vegetation and soils that this designation would have.

In response, Defendants note that through modifications of the 1987 Travel Plan, Route #2095A has been a part of the system routes long before their present action. Consequently, Route #2095A has been open for public motorized use and Defendants' present challenged decision did not expand the route's use in any way. In addition, under the ROD, Defendants have the given Route #2095A greater environmental protection in that the ROD closes the route during the spring months, from April 15 to May 22, in order to protect soil and vegetation growth at higher elevations. This reasoning carries into Plaintiffs' allegations regarding endangering elk habitats as well. As stated earlier, Route #2095A was already a public motorized-use route prior to Defendants' ROD. As such, with the seasonal closure of the Route, Defendants' ROD affords elk habitats greater protection than before the ROD.

Because of the reduced public motorized use of Route #2095A under the ROD than under the 1987 Travel Plan, Plaintiffs cannot show any environmental injury. *Douglas County v. Babbit,* 48 F.3d 1495, 1499 (9th Cir. 1995). Defendants present ROD action did not expand environmental use of the Route in anyway. To the contrary, motorized use has been reduced.

Looking next at Route #2096 which is open for motorized use under the ROD, Plaintiffs contend that there is no site-specific analysis even though Defendants' hydrologist noted that Route #2096 was located on "very steep slopes in the headwaters of Bridge Hollow that burned during the Red Waffle Fire. The Bridge Hollow channel system is highly unstable due to on-going post-fire hydrologic processes."[18]

In their response, Defendants note that its FEIS only examined water quality and watershedding issues on moderate and high risk non-system routes. Defendants contend that regardless of Plaintiffs' citation, Route #2096 was not designated as a moderate or high-risk route. Although a reading of Plaintiffs' excerpt does reflect some concern about the stability of the Route, the hydrologist's report does not recommend closure. Because Route #2096 was never designated as a moderate or high-risk route, this Court cannot conclude that Defendants were required to give the Route a "hard look" as required under NEPA.

In addition, Plaintiffs cite to other routes that they allege were not given the required "hard look" under NEPA, specifically Routes ## 2814, 2088, and 2092. However, Plaintiffs do not provide any specific support as to why these Routes were not adequately analyzed by Defendants. Consequently, this Court is not able

---

[18]*Hydrologist Report, AR V-037-01.*

to determine the validity of Plaintiffs' allegations.  For the foregoing reasons,

Defendants' Motion for Summary Judgment on this ground shall be GRANTED.


**II.**      ***Authorizing Dispersed Vehicle Camping within 300 feet of Either Side of
Every Motorized Road and Trail in the Pryor Mountains***.

Plaintiffs allege that Defendants' ROD decision to allow dispersed vehicle

camping was not adequately analyzed.  As noted by Plaintiffs, dispersed vehicle

camping (DVC) refers to the ability to drive off roads and trails for the purposes of

camping.  Under the challenged ROD, Defendants are allowing dispersed vehicle

camping within 300 feet of every designated motorized route within the Pryor

Unit.  Plaintiffs contends that this creates a 600 ft corridor along all roads and

trails that is subject to potential vehicle and camping damage.  Plaintiffs further

contend that this corridor, when aggregated across all motorized roads and trails

within the Pryor Unit, constitutes 8,900 acres of environmentally endangered land.

In objecting to the extent of Defendants' allowance of DVC, Plaintiffs

contend that Defendants utilized the least preferred application of DVC and

applied it in an overly broad manner.[19]  When implementing dispersed vehicle

camping decisions, Plaintiffs contend Defendants should apply it with caution and

carefully consider the impacts at the local and individual route level.  Plaintiffs

---

[19]36 C.F.R. § 212.51 creates a descending preferential hierarchy of dispersed vehicle
decisions ranging from not allowing any DVC to allowing DVC under the authority of the Travel
Management Rule.

contend that the Pryor Unit is an area that is rich in botanical species and diversity and that Defendants failed to take a hard look at the impact that their DVC decision would have on the native botanical population. Specifically, Plaintiffs argue that:

1. Defendants erroneously determined the impact assessment of DVC on vegetation based on a 300 foot wide corridor rather than the actual 600 foot corridor. As such the impacts of DVC are twice what the Defendants originally estimated.

2. In determining the impact assessment of DVC, Defendants only considered areas where individuals camp and fail to take into account the total area impacted by vehicles driving to and from the campsites.

3. Defendants erroneously assumed that off-road travel within the DVC corridor is limited to the direct route going to and from the campsite.

4. Rather than actually taking the time to walk, see and survey the environmental impact of the DVC corridor, Defendants relied on GIS topographic maps and satellite imagery in order to make their assessments.

5. Their FEIS noted areas that would suffer greater effects of DVC but failed to discuss the site-specific impacts of their ROD on these areas.

As a contrast, Plaintiffs cite to Defendants' analysis of the Main Fork of Rock Creek in the Beartooth Unit where Defendants took a hard look at how DVC would impact water quality, cultural resources and the aesthetics of the area. In that instance, Defendants limited camping to within a vehicle's length from the system road.

In response, Defendants contend that under the TMR, Defendants, as the responsible official "may include in the designation the limited use of motor vehicles within a specified distance of certain designated routes, and if appropriate within specified time periods, solely for the purposes of dispersed camping . . ." *36 C.F.R. § 212.51(b)*. Based on this, Defendants contend that their decision to use their discretion under the TMR to designate the scope and range of DVC was not in violation of law.

Contrary to Plaintiffs' claims, FEIS discussions regarding DVC note that the resulting DVC corridor is 600 ft.[20] Further, regardless of any hierarchical considerations in making DVC decisions, Plaintiffs have failed to show how Defendants exceeded the scope of their authority by establishing the DVC corridor in the manner that they did. This is specifically reflected in *36 C.F.R. § 212.51* which allows for Defendants to determine the manner and breadth of DVC decisions under the TMR. Moreover, compared to the 2001 Tri-State OHV decision, the Defendants' current ROD provides greater protections to Plaintiffs regarding dispersed camping within the Pryor Unit by reducing the number of routes available for motorized use and by restricting certain routes to seasonal access. Defendants' obligations under NEPA is to limit the environmental impact of its proposed agency action. 42 U.S.C. § 4332(C)(i). Given that the ROD

---

[20]*FEIS, 5-56.*

reduced the availability of DVC across the Pryor Unit by reducing the available routes to camp along, Plaintiffs cannot show how the ROD negatively impacted the Pryor Unit environment.

As to Plaintiffs' statements relating to Defendants' detailed impact analysis and limitation on use at Main Fork of Rock Creek in the Beartooth Unit, the FEIS noted the very high use and undesirable impact that DVC would have on that area. Because of that, it limited the DVC use within that area. This reflects a detailed consideration and the required "hard look" at the impacts of Defendants' ROD.

Through public comments found in the FEIS, Defendants were aware of the Plaintiffs' concerns about the potential impact DVC would have on soil, vegetation, erosion and environmental damage.[21] Defendants further noted that they were tracking the DVC use within the Beartooth District and have noticed some effects at certain site-specific locations but no widespread effect across the entire District.[22] In rejecting public comments that sought to narrow the scope of DVC, Defendants relied on the 2001 Tri-State OHV Decision which allowed for the same DVC within 300 feet of motorized routes. Lastly, Defendants' FEIS considered concerns relating to impact on soils, vegetation and found that

---

[21]*FEIS, 5-54 to 5-56.*

[22]*FEIS, 5-56.*

allowing a 600 foot DVC corridor would be a means of minimizing heavy use and environmental damage.[23]

Looking next at the risks of DVC on native vegetation, it is evident that the Defendants did look at affected areas of low to high DVC use.[24] The FEIS analyzed the magnitude and potential DVC effects on native vegetation under all the different Alternatives.[25] Based on this, the FEIS noted that the potential impact for motorized and non-motorized use on vegetation for frequent use, which includes DVC, for the ROD's chosen Alternative B Modified, was less than 1% of the total Pryor Unit high risk areas.[26] In addition, under the ROD, Defendants recognized the seasonal impact of motorized use on native vegetation and thus limited motorized use during certain seasons, like spring thaw, in order to protect vegetation resources.[27] Based on these considerations, the FEIS concluded that the implementation of its ROD would not have significant cumulative effects associated with native vegetation.[28] Defendants further acknowledge that the impact of camping can be locally very significant. However, they noted that the

---

[23]Id at 5-56 to 5-57.

[24]Id. at 3-182.

[25]Id. at 3-184 to 3-193.

[26]Id. at 3-187.

[27]Id. at 3-188.

[28]Id.

total area of impact is small when compared against the various ecosystems of the project area.[29]

Next, Plaintiffs contend that Defendants never analyzed how DVC would impact water and soil quality and productivity. Specifically, Plaintiffs contend that any soil quality discussions were general in nature and did not address the specific impact that DVC would have. Plaintiffs contend that a soil specialist report should have been performed and submitted. Further, they contend that Defendants erred when they chose to rely on an allegedly outdated 35 year old Carbon County Soil Survey.

The record notes that Defendants did consider the effects of DVC and motorized use on soils during certain times of the year by restricting motorized use on 58 miles of routes during certain times of the year.[30] Further, Defendants considered the impact that DVC would have on water quality and therefore limited DVC when near a stream or watershed.[31] Moreover, any sediment issues affecting water quality that could arise from DVC use is minimal when compared against other sediment load causing factors.[32] The Court notes that many routes were not

---

[29]*Id. at 3-190.*

[30]*Id.*

[31]*Id., 5-113.*

[32]*Id.*

included in the Defendants' final ROD because of the detrimental effects that such continued use would have on the soil.

Plaintiffs also claim that Defendants violated NEPA by not adequately taking a "hands-on" approach to their consideration of DVC effects within the Beartooth District. However, the Court's review of the record is replete with field studies, inventories, detailed GIS mapping, site-specific discussions, and discussions of every system and non-system routes and its environmental impacts.

To the extent that Plaintiffs allege that Defendants erroneously relied on a 35 year old Carbon County Soil Survey, Plaintiffs fail to point out how the survey is outdated and does not reflect the present character of the Pryor Unit's soil composition. Further, relying on the Carbon County Soil Survey, Defendants' FEIS noted that the extent and distribution of soil crusts within the Pryor Unit was very limited and could only exist in areas of low vegetative cover and lower elevations.[33] Moreover, soil crusts do not normally occur on or near existing road or trails due to the level of existing disturbance and the majority of regularly used campsites currently have some level of disturbance, thus minimizing the likelihood of soil crusts. Lastly, the more heavily used dispersed campsites are

---

[33]*Id. at 3-168.*

generally found in areas with higher vegetative cover, some shade, and at higher elevations and thus have no effect on soil crusts.[34]

Based on these discussions, this Court concludes that the Defendants sufficiently considered the potential impact of DVC use on soil systems and soil crusts. Defendants' conclusion that the impact of DVC on the soil would be largely limited to the pre-ROD disturbance was not arbitrary and capricious.

Lastly, Plaintiffs allege that Defendants violated NEPA and the TMR by failing to perform soil standard testing. This Court disagrees. The scope of the ROD at issue is to manage the manner and use of transportation and routes within the Beartooth District which include the DVC corridor. The purpose of the ROD is not to manage soil use within the District. Although the DVC corridor has some soil impact, this Court concludes that its character and impact is more aligned with transportation and route use and thus the Defendants did not violate NEPA and the TMR for failing to perform soil standards testing.

For these reasons, this Court concludes that Defendants took a hard look at the effects of DVC on soil, vegetation and overall environmental damage. Moreover, the ROD has reduced prior motorized and non-motorized routes with the Beartooth District. As such, the Defendants' present actions provides greater environmental protections to the District then were afforded under the prior

---

[34]*Id.*

regulatory regime, specifically the 2001 Tri-State OHV Decision.  For the foregoing reasons, Defendants' Motion for Summary Judgment on this ground is GRANTED.


### III.  *Permanently and Negatively Impairs Land Productivity and Soil Quality.*

Plaintiffs allege that Defendants' ROD failed to take in the impact of damage to soils, watershed, vegetation and wildlife habitat as required by Executive Order 11644 and the TMR.  Plaintiffs go so far as to contend that Defendants are obligated to "reduce (not necessarily eliminate) to the smallest possible degree the unwanted damages to soils, native vegetation, and elk and deer habitat."[35] Plaintiffs allege that Defendants' decision under the ROD that allows for DVC along every motorized trail and road in the Pryor Unit evidences Defendants' failure to take any steps to minimize damage to environmental resources.  Specifically, Defendants have allegedly (1) permitted routes that invade secure elk and deer habitat; and (2) designated seasons of use based less on protection of forest resources than on appeasing motor recreationists.

Although Plaintiffs concede that Defendants have addressed minimization by identifying resource concerns, by designating a number of system resources, by not designating certain routes, and limiting seasons of use on certain routes, they

---

[35]*Memorandum in Support of Plaintiffs' Motion for Summary Judgment, pp. 20-21.*

argue that Defendants have not gone far enough, choosing instead to accommodate motor-vehicle recreationists.

Looking at Defendants' decisions relating to the timing of seasonal use restrictions, they point to scientific support and analysis by way of snow pack telemetry data that determines when certain routes are more susceptible to soil damage.[36] As such, Defendants have stated a non-arbitrary and non-capricious reason for setting the seasonal restrictions on motorized use.

More importantly, Defendants note that the applicable regulation that Plaintiffs rely on does not mandate minimization of environmental damage. Rather, it states that,

> In designating National Forest System trails and areas . . . the responsible official shall **consider the effects** on the following with the **objective** of minimizing . . . (3) Damage to soil, watershed, vegetation, and other forest resources . . ." *36 C.F.R. § 212.55(b)(2) (emphasis added).*

After review and consideration, this Court concludes that this section does not mandate action. Rather, it is intended to lend guidance and maintain the regulation's objectives. Where a regulation does not require action or create a compulsory duty on behalf of the agency, a plaintiff cannot compel agency action. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). The ability to compel agency action is carefully circumscribed to situations where an agency

---

[36]*FEIS, Appendix F at F-1.*

has ignored a specific legislative command.  *Hells Canyon Pres. Council v. U.S.*
*Forest Serv.*, 593 F.3d 923, 932 (9th Cir.2010).  From the language of the
applicable regulation, this Court cannot conclude that such a command for agency
action exists.  Defendants' Motion for Summary Judgment on this ground is
GRANTED.

## IV.    *USFS Failed to Minimize Conflicts*

Lastly, Plaintiffs contend that Defendants failed to minimize conflicts of use
between recreational off-road users and other types of recreational users as
required under Executive Order 11644 and the TMR. *36 C.F.R. § 212.55(b)(3).*  In
support, Plaintiffs cites to public comments regarding certain steep and narrow
routes that pose risks of danger when mixed recreational use is permitted.[37]
Plaintiffs contend that even though Defendants acknowledge these risks, they
declined to consider it as a criteria in their determination of routes designated for
motorized use.

A review of this claim makes no allegation that any specific action by
Defendants was arbitrary and capricious.  Rather, much like the aforementioned
discussion regarding *36 C.F.R. § 212.55(b)(2), 36 C.F.R. § 212.55(b)(3)* appears

---

[37]One comment related to the risks that stock could get "excited and dangerously reactive
when overtaken or approached by noisy machines." *Plaintiffs Memorandum of Law in Support
of Motion for Summary Judgement, p. 20.*

to lend guidance and maintain the regulation's objectives rather than legislatively mandate action. From this Court's review, the applicable regulation appears to remind the Agency when designating route use, to strike a balance between the range of disparate recreational users. This Court concludes that the regulation does not require action or create a compulsory duty on behalf of the agency. *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir.2010). As such, Plaintiffs cannot compel Defendants to "minimize conflicts."

Regardless, Defendants' FEIS recognized the differing interests and opinions regarding the appropriate use of the Beartooth District.[38] This is fully evident from a review of the extensive and varying public comments found in the FEIS. Defendants' FEIS makes detailed discussion of the disparate interests of the human environment in the Beartooth District as they relate to each specific Alternative. The FEIS noted trends in increased popularity in outdoor recreation use, increased motorized off-road use, and increases in the Montana population.[39]

Taking these concerns together, the FEIS recognized two major groups of recreationists: motorized users and non-motorized users. The FEIS noted that motorized and off-road vehicle users utilize their activity as a way for families and

---

[38]*FEIS, 3-36 to 3-39.*

[39]*Id. 3-35 to 3-36.*

friends to enjoy the outdoors together or to retrieve game during hunting season.[40]

Many of these users also indicated a need for some restrictions on motorized use

and a greater law enforcement presence. In contrast, non-motorized users utilize

the Beartooth District as a place for quiet, peaceful experiences away from the

rushing and crowding of everyday life. The FEIS noted non-motorized user

concerns revolve around conflicts with motorized users including visuals, noise,

wildlife displacement, harassment, and resource damage.[41] The FEIS went on to

discuss the conflicts and use ramifications each Alternative would have on these

distinct groups of users. The FEIS noted that given the divergent means of

enjoyment by these recreationist, "as travel management decisions are made . . .

conflict is not likely to be alleviated."[42]

Common sense informs the Court that these divergent approaches to the

enjoyment of the Beartooth District are irreconcilable. Given the wide spectrum

of recreational users of the Beartooth District, it is evident that no single

alternative would fully appease all users. Rather, Defendants like the USFS are

tasked with the difficult and often precarious duty of striking the best balance

possible in order to protect the environmental integrity of its charge while

---

[40]*Id. at 3-36.*

[41]*Id.*

[42]*Id. at 3-39.*

ensuring that the maximum recreational use of natural resources are available to all interested parties. From of all the five available Alternatives, Defendants' decision to proceed with Alternative B Modified reflects that precarious balance. All other remaining Alternatives favored one group of users at the detriment of other users. Consequently, this Court concludes that Defendants did take the necessary "hard look" at the potential conflicts between users and their decision to proceed with Alternative B Modified was not arbitrary and capricious. Defendants' Motion for Summary Judgment on this ground shall be GRANTED.

## CONCLUSION

An agency's decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Review under the arbitrary and capricious standard is narrow, and we do not substitute our judgment for that of the agency." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir.2008), overruled in part on other grounds by *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

The FEIS that was the basis for Defendants' Record of Decision took roughly four years in the making and constitutes almost 600 pages of environmental review, consideration of alternatives, public comments, environmental studies, detailed analyses and discussion. It considered all relevant

environmental impacts that the creation of a TMP would have on the Beartooth District including soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, and other resources. The FEIS considered and performed a route by route review of every single route that was designated to be a system route, including routes that were ultimately discarded from the TMP. It considered the impact that dispersed vehicle camping would have on the surrounding terrain. In fashioning and deciding on proceeding with Alternative B Modified, Defendants considered what was the best balance of use and resources in order to accommodate the wide and divergent class of recreational users in the Beartooth District. Lastly, Defendants' present actions provides greater environmental protections to the Beartooth District then were afforded under the prior regulatory regime, specifically the 2001 Tri-State OHV Decision.

On this record, this Court cannot conclude that the Defendants acted in an arbitrary and capricious fashion when they designated certain existing roads and trails for public motorized use and allowed dispersed vehicle camping along those routes. Therefore, this Court holds that the Defendants' FEIS and ROD did not violate NEPA, NFMA, the TMR and Executive Order 11644.

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.   Defendants' Cross-Motion for Summary Judgment (*Doc. # 32*) is
     GRANTED.

2.   Plaintiffs' Motion for Summary Judgment (*Doc. # 21*) IS DENIED.

3.   Intervenors' Cross-Motion for Summary Judgment (*Doc. # 30*) is
     GRANTED.

4.   The Clerk of Court shall enter Judgment in favor of Defendants and
     Intervenors.

5.   All other pending motions are DENIED as MOOT.

The Clerk of Court shall notify the Parties of the making of this Order.

DATED this 20th day of July, 2011.


*/s/ Richard F. Cebull*
HON. RICHARD F. CEBULL
CHIEF U. S. DISTRICT JUDGE